UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ANTONIO D. JONES,

      Petitioner,

         v.                      CAUSE NO. 3:18-CV-4-JD-MGG

WARDEN,

      Respondent.

## OPINION AND ORDER

Antonio D. Jones, a prisoner without a lawyer, filed a habeas corpus petition to challenge his conviction for four counts of felony murder under Case No. 45G04-0401-MR-3. Following a jury trial, on October 4, 2011, the Lake Superior Court sentenced him to two hundred forty years of incarceration.

## FACTUAL BACKGROUND

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Court of Appeals of Indiana summarized the evidence presented at trial:

> On January 16, 2004, at approximately 6:00 p.m., Ronyale Hearne dropped off her twenty-three-month-old son, A.J., at the home of his father, Anthony McClendon, Sr., on Polk Street in Gary. McClendon lived at the residence with Laurice and Jimmy Jones (collectively, the Joneses).
>
> Hearne and her cousin, Donte Mills, returned to the residence on Polk Street to get A.J. shortly after midnight. She went upstairs, the door was open, and she saw Laurice on the couch "like she could be dead." Hearne called McClendon's brother, Roosevelt Pickens, who arrived at the scene

shortly thereafter. She walked further into the apartment and saw Jimmy's body on the bathroom floor. She then saw Pickens standing over McClendon and holding A.J. It appeared as if McClendon's "whole face was just blown open."

Hearne took A.J. from Pickens and ran downstairs. Mills drove A.J. and Hearne to Northlake Hospital. At some point, Hearne pulled up A.J.'s shirt and noticed that he had a hole in his side. A.J. was eventually transported to the University of Chicago Hospital by ambulance. It was determined that A.J. had suffered two gunshot wounds that had passed through his body. A.J. later died from his wounds.

Pickens telephoned his friend, Terrell Bowens, upon arriving at the scene. Bowens went to the apartment, contacted the police, and waited approximately ten minutes for their arrival. At the residence, the police saw the bodies of McClendon and the Joneses and also discovered scales and powder cocaine on the kitchen counter as well as cocaine cooking on the stove.

During the investigation, the police were able to determine that three different types of firearms were used in the murders. Autopsies performed on McClendon and the Joneses revealed that all three had died from multiple gunshot wounds.

On January 16, 2004, Maurice Fuller and Anita Goldsby held a party at their apartment in Gary that started around 7:00 p.m. There were about twenty people at the party, and James Parks, Lenzo Aaron, and Jones were there and playing cards for money. At some point, Fuller bumped into Jones in the kitchen. The two were "joking around," and Jones lifted up his shirt and revealed the butt of a gun. Jones said, "You don't want none of this." Fuller described Jones's handgun as an automatic, "like a 9mm or a .45."

While the three were playing cards at the party, Aaron and Parks got into an argument over some money. Jones was Aaron's partner in the card game. The argument was settled, and Aaron told Parks to keep the money in dispute. At some point, Jones walked into the kitchen and said, "We just got a call from some dude . . . do you want to go rob him?" Jones said that the caller had $6000 and some drugs in his possession. Aaron and Parks both agreed to rob the caller, and Parks and Jones left. However, they returned to pick up Aaron, and the three then left again in Jones's white Buick Roadmaster to commit the robbery. By this point, Aaron had

seen the butt of the black semi-automatic handgun tucked into Jones's waist. An AK–47 assault rifle was also on the backseat of Jones's vehicle.

When the three arrived at the Polk Street residence, Jones went in first, followed by Parks and then Aaron. Aaron was carrying the AK–47 rifle. After the three went up the stairs, Jones knocked, someone came to the door and asked who was there, and Jones replied, "It's Tone." As soon as the person inside opened the door, someone fired five or six shots. After the three entered, Aaron saw Laurice and A.J. on the couch. Parks and Jones had gone to the back of the residence, and at some point, Aaron heard Parks say, "Where the sh*t at, man?" The man he was talking to responded, "Tone, James G. It's like this man? It's like this?" Laurice was pleading with Aaron, "Please, sir, don't kill me. Please don't kill me." Aaron shook his head to indicate he was not going to harm her. However, Aaron, who was unable to see into the back of the apartment because a sheet was hanging in the doorway, heard Parks say, "Finish him off. Finish him off." The others returned to the living room and grabbed the AK–47 off Aaron's shoulder. Thereafter, they went to the rear of the apartment and Aaron heard two more shots.

Jones left, while Aaron and Parks remained in the living room. Parks told Aaron, "Finish the lady off, man." Aaron told Parks, "Man I didn't come here for that, I ain't killing nobody," then left the apartment. As Aaron was leaving, he heard two more shots.

Aaron did not take anything from the apartment, nor did he see Parks or Jones take anything. However, he was originally told that they were going to steal $6000, with each of them to take $2000 from the robbery. Thereafter, Jones drove the three to the Oak Knoll apartments. Sometime after 12:50 a.m., Jones called Janeth Alexander for a ride, explaining that he had lost his keys. When Alexander arrived, Jones's vehicle was outside. After Alexander picked him up, and they were driving along a drainage ditch on Chase Street, Jones asked her to stop the vehicle. However, Alexander refused because the weather was bad. Jones said he had been drinking, and Alexander thought that he appeared to be "hot or sick ." Jones rolled the window down, and she heard "something go off — you know, hit the water." Jones turned around and asked her, "you didn't see that, did you?" Jones had tossed the gun into the water.

After Jones was arrested, he called Alexander from the jail. Jones told her that she was his alibi, and that his life was in her hands. After Alexander testified in another proceeding, Jones called her and said that he was going to kill her.

The day after the murders, Parks knocked on Aaron's door, gave him $230, and asked him, "was he straight," which Aaron took to mean, was he "cool with the $230." Aaron feared for his life and that of his girlfriend, so he accepted the $230.

Meanwhile, on January 19, 2004, Detective Michael Jackson talked to Jeffrey Lewis, Parks's brother, about the incident on 2600 Polk, but Lewis did not identify himself at that time. Detective Jackson spoke again with Lewis on January 20, 2004, and for the first time in person on January 21, 2004. Lewis provided a written statement. Detective Jackson spoke with Lewis several times thereafter. Lewis knew that Parks had an AK–47 and that Parks had obtained the rifle through Shawn Dixon. He had seen Parks with the AK–47 and also described to Detective Jackson a .22 caliber weapon that Parks had obtained from a person named "Hype." Lewis had also seen Jones with a .45 caliber weapon on his lap before the night of the murders.

Based on information that Lewis had provided, police officers were instructed to go to three separate locations to conduct surveillance on Parks, Aaron, and Jones. Search warrants were issued that culminated in ten searches, which included the residences of Aaron, Dixon, Parks's father, Parks's cousins' home, the address where Jones allegedly resided, and Parks's girlfriend's home. Police also searched the home of Jones's girlfriend, Teshonta Champion.

Fuller had known Parks for almost six years and had gone to a gun store with him to purchase the AK–47. However, they were unable to make the purchase. Instead, Dixon went to the store and made a down payment on the weapon. Dixon purchased the rifle for Parks, who paid Dixon the money for the gun.

The AK–47 was later fired at Brandy Parks's house at the Oak Knoll Apartments on New Year's Eve. The police subsequently found nine shell casings from a 7.62 x 39 mm weapon at the quadruple murder scene. This caliber of ammunition is fired from AK–47 and AK–47 copy-type firearms. It was determined that they all had been fired from the same weapon. The police also found eighteen 7.62 x 39 mm casings near Dixon's house, all of which had been fired from the same weapon. These, in turn, were fired from the same weapon that fired the nine rounds found at the Polk Street residence. The police also found seven more 7.62 x 39 mm cartridge casings, collected from Brandy's residence. Those rounds were also fired

by the same weapon that fired the 7.62 x 39 mm rounds at the Polk residence.

On January 26, 2004, Aaron was arrested, and Parks was arrested the next day. On the same day, Jones entered the police station and stated that some detectives from Gary were looking for him. Jones was also placed under arrest.

When Aaron was asked about the incident on Polk Street, he requested legal counsel, and the questioning ceased. Aaron later asked to talk with Detective Richardson, and he provided a formal written statement on January 28, 2004. Aaron implicated himself in the murders on two occasions and was initially charged with four counts of murder. Aaron subsequently entered into a plea agreement on May 6, 2004, which called for him to plead guilty to four counts of class A felony robbery. It was an open plea, pursuant to which Aaron would be sentenced within a range of twenty to fifty years for each count, to be served concurrently. As a term of the plea agreement, Aaron agreed to cooperate with the police.
On January 29, 2004, Jones was charged with four counts of felony murder. Following a jury trial on May 17, 2004, Jones was found guilty as charged, and was subsequently sentenced to 240 years of incarceration. We affirmed Jones's conviction on direct appeal, and he subsequently petitioned for post-conviction relief. Following a hearing on February 26, 2007, the post-conviction court denied his request for relief on September 11, 2007. After we affirmed the denial of post-conviction relief, Jones petitioned for a writ of habeas corpus on February 13, 2009. The district court denied Jones's request for relief, finding that Jones had failed to establish a violation of due process with respect to the admission of the challenged statements and determining that we had reasonably found any error to be harmless.

However, on March 31, 2011, the United States Court of Appeals for the Seventh Circuit reversed the district court's holding with regard to the propriety of the hearsay statements that were admitted. As a result, Jones was ordered to be released if he was not tried within 120 days of the mandate. *Jones v. Basinger*, 635 F.3d 1030 (7th Cir. 2011). Jones was retried on four counts of murder, and a jury found him guilty as charged. Jones was subsequently sentenced to four consecutive sixty-year terms of incarceration, and he now appeals.

ECF 18-7 at 1-3; *Jones v. State*, 974 N.E.2d 602 (Ind. App. 2012).

In the amended petition, Jones argues that he is entitled to habeas relief because the trial record lacked sufficient evidence to support the convictions of felony murder and because the trial court erred by allowing the admission of hearsay evidence through Detective Jackson and Jeffery Lewis and by excluding testimony that Jones had testified against Aaron's family member in a criminal trial. He further argues that he received ineffective assistance of counsel because trial counsel allowed Janeth Alexander to testify that he had threatened her and failed to impeach Alexander and Lenzo Aaron.

Jones also filed a motion to file a second amended traverse to include additional arguments related to telephone records to support his grounds for habeas relief and three additional grounds for habeas relief, including ineffective assistance of trial counsel for failing to object to the prosecution's arguments about his telephone calls to Anthony McClendon, for defects in the charging information, and for cumulative error. Grounds for habeas relief and the factual support for each ground should be asserted in a petition, while responses to the arguments presented in the Warden's brief should be asserted in a traverse. Section 2254 Rule 2(c); Section 2254 Rule 5(e). Because Jones seeks to amend the traverse for an improper purpose, the court denies the motion for leave.

Moreover, the court would deny leave to amend even if Jones had instead filed a motion to amend the petition to include these additional bases for habeas relief. At this stage of the proceedings, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). "Reasons for finding that leave should not

be granted include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Airborne Beepers & Video, Inc. v. AT & T Mobility LLC*, 499 F.3d 663, 666 (7th Cir. 2007).

In the proposed second amended traverse, Jones seeks to raise procedurally defaulted claims. While Jones proceeded pro se during State post-conviction proceedings, the record demonstrates that Jones was aware of these claims as his petition was pending before the Lake Superior Court as early as April 2015. PCR Tr. 117-18, 182-83, 221-25. Jones initiated this habeas case in January 2018, so it is unclear why he is seeking to raise these claims for the first time in this case more than three years later in April 2021. Further, allowing such an amendment would cause substantial prejudice to the Warden; since filing the response three years ago, the Warden has substituted counsel, so preparing a response to newly raised claims would entail, at minimum, a thorough, first-time review of the voluminous record, which contains a trial transcript that, by itself, spans 2,395 pages. ECF 18, ECF 21, ECF 51. Finally, as the court will explain in greater detail below, the proposed amended traverse would be futile because the additional grounds lack merit and because there is no basis to excuse a procedural bar. Therefore, the motion to file a second amended traverse is denied.

<u>PROCEDURAL DEFAULT</u>

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A);

*Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). To avoid procedural default, a habeas petitioner must fully and fairly present his federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does, however, require "the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (internal quotations and citations omitted). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Id.* Jones presented the claims in the amended petition to the Court of Appeals of Indiana and the Indiana Supreme Court but did not present the additional claims in the proposed second amended traverse to the State courts at any level. ECF 18-4; ECF 18-8; ECF 18-10; ECF 18-14.

Jones asserts actual innocence as a basis to excuse procedural bar. A habeas petitioner can overcome a procedural default by establishing that the court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006). To meet this exception, the petitioner must establish that "a constitutional violation has resulted in the conviction of one who is actually innocent

8

of the crime." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 536–37 (2006). In this context, the court may consider evidence only if it is reliable and was not presented at trial. *Gladney v. Pollard*, 799 F.3d 889, 898 (7th Cir. 2015). The additional claims in the proposed second amended traverse do not involve new evidence and thus could not establish that no reasonable juror would found have him guilty in light of new evdence.

Jones also asserts lack of counsel during State post-conviction proceedings to excuse procedural bar. A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and a resulting prejudice from that failure. *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977); *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 2382 (2009). Cause sufficient to excuse procedural default is defined as "some objective factor external to the defense" which prevented a petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier*, 477 U.S. 478, 492 (1986). As a general rule, "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as cause." *Maples v. Thomas*, 565 U.S. 266, 280 (2012). "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *Brown v. Brown*, 847 F.3d 502 (7th Cir. 2017). "[A] prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the

9

prisoner must demonstrate that the claim has some merit." *Id.* at 14. As detailed below, the court finds that the procedurally defaulted claims regarding trial counsel are not substantial and declines to excuse procedural default.

<u>STANDARD OF REVIEW</u>

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods,* 135 S. Ct. at 1376 (quotation marks and citations omitted). Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must

be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

ANALYSIS

Sufficiency of the Evidence

Jones asserts that he is entitled to habeas relief because the testimony of Lenzo Aaron regarding Jones' participation in the robbery was incredibly dubious and because the trial record did not contain sufficient evidence that Jones intended to commit a robbery. Under Indiana law, claims of incredible dubiosity are a subset of insufficiency of the evidence claims. *See Moore v. State*, 27 N.E.3d 749, 754 (Ind. 2015). For sufficiency of the evidence claims, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

The prosecution charged Jones with four counts of felony murder, alleging that Jones, Aaron, and James Parks killed Laurice Jones, Jimmy Jones, Anthony McClendon, Sr. ("McClendon"), and Anthony McClendon, Jr. ("A.J."), during the commission of a robbery or an attempted robbery. PCR App. Ex. 21. At the second trial in 2011, the

11

testimony of Aaron presented the most complete narrative regarding these murders. Trial Tr. 1185-1251. According to Aaron, he played cards with Jones and Parks at a party, and Jones asked him and Parks if they wanted to rob someone who had six thousand dollars to purchase drugs, and they agreed. *Id.* at 1197-1200. They left the party in Jones's vehicle and entered McClendon's residence. *Id.* at 1200-08. Aaron encountered Laurice Jones and A.J. in the living room and waited as Jones and Parks went to the back of the house. *Id.* at 1210-12. Aaron heard gunshots as well as a man pleading with Parks. *Id.* After Jones left the residence, Aaron gave his firearm to Parks. *Id.* at 1221-27. When Aaron left the residence, Parks, Laurice Jones, and A.J. remained in the living room, and Aaron heard additional gunshots as he walked away. *Id.*

The trial record is replete with evidence corroborating Aaron's narrative about the following events. Serika Mills and Maurice Fuller, who were at the party, observed Jones, Aaron, and Parks playing cards together and that Jones had a handgun. *Id.* at 1126-28, 1154-60. They observed the three individuals leave and return to the party together. *Id.* Shawn Dixon purchased an AK-47 for Parks, and bullets fired from this weapon were found at the residence of Dixon and Parks's sister. *Id.* at 1484-1500. Law enforcement recovered bullets from three different weapons at the crime scene, including bullets that had been fired from the same AK-47 and .45 caliber bullets. *Id.* at 1452-70, 1787-1821, 1826-55. Telephone records demonstrated that Jones had spoken with McClendon earlier on the date of the murders. Trial Ex. 219. Alexander testified that Jones had asked her to serve as his alibi and threatened her when she declined to do so. Trial Tr. at 1641-75. The prosecution also introduced numerous motives for Jones

to rob McClendon, including significant financial difficulties, animosity toward McClendon as a rival drug dealer, and romantic interest in Ronyale Hearne with whom McClendon had fathered A.J. *Id.* at 404-06, 1587-94, 1882-1906; Trial Ex. 228A.

On direct appeal, the Court of Appeals of Indiana rejected the insufficiency of the evidence claims, finding that the trial record for the second trial contained ample evidence to corroborate Aaron's testimony and the guilty verdicts. ECF 18-7 at 7-8. Based on the evidence presented at trial, the court cannot find that the State court made unreasonable determinations on these claims. A rational trier of fact viewing this evidence in the light most favorable to the prosecution could have found that Aaron's testimony was credible and that Jones participated in the robbery. Consequently, the claims regarding sufficiency of the evidence are not a basis for habeas relief.

<u>Right to Confront Accusers</u>

Jones argues that he is entitled to habeas relief because the trial court admitted hearsay evidence through the testimony of Jeffery Lewis and Detective Jackson in violation of his rights under the Confrontation Clause. The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him," which includes the right to cross examine such witnesses. *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). "The Amendment contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him." *Giles v. California*, 554 U.S. 353, 358 (2008). "Statements are

nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006). "They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.*

Jones was first convicted of the felony murders in 2004, but the Seventh Circuit Court of Appeals invalidated this conviction on habeas review in *Jones v. Basinger*, 635 F.3d 1030 (7th Cir. 2011). In that opinion, the Seventh Circuit described Detective Jackson's testimony as follows:

> According to Detective Jackson, a man had contacted police two days after the murders and claimed to have information about them. The man refused to identify himself or provide any information but said he would call back later. When the man called back the next day, he identified himself as Jeffrey Lewis and said that he wanted to talk about what had happened at McClendon's apartment.

> Detective Jackson met with Lewis the next day, and Lewis told Jackson who committed the shooting, what took place, the type of weapons that they used, and where all of these individuals were or lived. Specifically, Lewis claimed that his brother James Parks had confessed to Lewis that he, Aaron, and Jones had committed the four murders. According to Lewis, Parks had told him that the three men were at a party together before going to rob McClendon's apartment. Lewis also said that his brother had supposedly told him the motive for the robbery: Jones needed the money to pay his rent.

> Lewis also told the police that Parks had provided a number of specific details about the shootings. The men had gained entry into McClendon's apartment, Lewis said, by simply knocking and asking to be let in. Once inside, Lewis told the detectives, Jones declared that "they couldn't leave any witnesses," and Parks told Aaron to "finish off" Laurice Jones. Lewis

also said that his brother had told him that Jones and the others had made off with "a large sum of money from the residence."

Lewis said the murder weapons were a .22–caliber handgun, a .45–caliber handgun, and an AK–47 assault rifle, and he provided descriptions of the .45–caliber and the AK–47. A man named Shawn Dixon had purchased the AK–47 for Parks, and Lewis had seen Jones with the .45–caliber "a lot of times." According to Lewis, Parks still had the AK–47, but the handguns had been discarded in a swampy area or waterway near Chase Street in Gary.

*Id.* at 1037.

The Seventh Circuit found that Detective Jackson's account of what Lewis had told him constituted testimonial hearsay in violation of the Confrontation Clause. *Id.* at 1043. The appellate court recognized the need for a course of investigation exception to the rule against hearsay to "bridge gaps in the trial testimony that would otherwise substantially confuse or mislead the jury." *Id.* at 1046-47. However, the appellate court advised that such exceptions should be applied narrowly, stating that, "[i[f some brief item is truly necessary, the court should redact a lengthy out-of-court statement to the extent needed to ensure that its actual evidentiary function is only the legitimate one for which it is being admitted." *Id.* It observed that, "[t]o whatever extent the prosecution feared that the jury would be confused if it did not know exactly why the police started investigating Jones, that fear could have been assuaged by as little as a bare-boned statement that the police acted 'on information received from Jeffrey Lewis.'" *Id.* Finally, the appellate court concluded that the hearsay evidence had a substantial and injurious effect because it "essentially served as a roadmap to the prosecution's entire care against Jones." *Id.* at 1053.

In opening statements at the second trial, the prosecution told the jury that they would hear from Lewis, that he was the brother of Parks, that he spoke to Detective Jackson, and that, based on that information, Detective Jackson began investigating Jones, Parks, and Aaron. Trial Tr. 302. Lewis testified, confirming that Parks was his brother but maintaining that he could not remember whether he had conveyed information about the murders from Parks to law enforcement or whether Parks possessed an AK-47.[1] *Id.* at 960-61, 964-69, 977-78. Detective Jackson confirmed that he began investigating the three individuals after speaking with Lewis in January 2004. *Id.* at 1052-56. The prosecution reiterated this information to the jury during closing arguments. *Id.* at 2306-13.

On direct appeal, the Court of Appeals of Indiana rejected this claim, finding that the testimonies of Lewis and Detective Jackson did not convey what Parks had told Lewis or what Lewis had told Detective Jackson in the early stages of the investigation and thus finding no hearsay. ECF 18-7 at 3-6.  In essence, the problematic portions of the testimony from the first trial were not repeated in the second trial. The appellate court further found that the trial court and the prosecution had complied with the Seventh Circuit ruling. *Id.* After reviewing the trial transcript, this court agrees that the contents of the statements from Parks to Lewis and from Lewis to Detective Jackson were not disclosed to the jury. The court observes a stark contrast between the barebones

---

[1] The record includes substantial bases to question Lewis's professed inability to recall relevant facts, including his far more informative testimony on the relevant facts at a deposition a week prior to trial, his representation at trial that he did not want to testify, and his concern for the safety of his family.

testimony at the second trial with the Seventh Circuit's summary of the detailed and highly incriminating testimony at the first trial. Jones argues that the jury could have inferred the existence of accusatory inadmissible hearsay statements, but, critically, he cites no authority to suggest that this inference in itself constitutes a violation of the Confrontation Clause. Therefore, the claim that the trial court violated his rights under the Confrontation Clause is not a basis for habeas relief.

<u>Right to Present a Complete Defense</u>

Jones argues that the trial court's exclusion of evidence regarding Aaron's bias towards him violated his right to present a complete defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). To demonstrate a violation of this right, "the proffered evidence must be essential to the defendant's ability to present a defense; it cannot be cumulative, impeaching, unfairly prejudicial, or potentially misleading." *Kubsch v. Neal*, 838 F.3d 845, 858 (7th Cir. 2016). Further, "the evidence must be reliable and trustworthy. One, though not the only, way that reliability and trustworthiness can be demonstrated is to show that the evidence closely resembles evidence that would be admissible under the state's rules." *Id.*

The trial court allowed trial counsel to conduct offers of proof on the allegation of bias. During one such offer of proof, Aaron testified as follows:

**Trial Counsel:** Alright, are you acquainted with Kevin Wash?

17

**Aaron:** I know him, yes.

**Trial Counsel:** Who is Kevin Wash to you, is he a relative?

**Aaron:** No.

**Trial Counsel:** Are you simply acquaintances?

**Aaron:** Yeah, he's cool. We played baseball together when we was kids.

**Trial Counsel:** Did you go to school together?

**Aaron:** Yes.

**Trial Counsel:** How many years have you known Kevin Wash?

**Aaron:** Quite a while, probably since I was seven years old, eight years old.

**Trial Counsel:** Since you were seven or eight?

**Aaron:** Yes.

**Trial Counsel:** And you're how old today?

**Aaron:** Thirty-one.

**Trial Counsel:** Sir, are you aware that back in 1999 or so, Mr. Wash was charged with several other defendants in a Federal drug trial?

**Aaron:** Yes.

**Trial Counsel:** And during that Federal drug trial, were you aware that Antonio Jones, the defendant in this case, testified against his co-defendants, including Kevin Wash?

**Aaron:** No, sir.

**Trial Counsel:** You were not aware of that?

**Aaron:** No, sir.

**Trial Counsel:** Were you aware that Kevin Wash was sentenced as a result of that drug trial?

**Aaron:** I know -- yes.

**Trial Counsel:** Did you know what caused that sentence?

**Aaron:** No.

**Trial Counsel:** Alright. Did you ever make any kind of threat to my client, Mr. Jones, like something to the effect that, "You're going to get what you got coming to you because you testified against Kevin Wash?"

**Aaron:** No, sir.

* * *

**Prosecutor:** You say that you knew Kevin Wash was charged Federally?

**Aaron:** Yes.

**Prosecutor:** January 16 of 2004, did you know this defendant was one of the individuals who was charged with Kevin Wash?

**Aaron:** No.

**Prosecutor:** When did you become aware that this defendant was one of the individuals who was charged with Kevin Wash?

**Aaron:** On the first trial, my counsel came and asked me, did I know Kevin Wash?

**Prosecutor:** Okay, and when you say "your counsel", who was that, do you remember who the attorney was?

**Aaron:** Lemuel Stigler.

**Prosecutor:** Stigler came and asked you, did you know Kevin Wash? And that was the very first time that you even became aware that this defendant was even charged with Kevin Wash?

**Aaron:** Yes, ma'am.

*Id.* at 1265-68.

During another offer of proof, Jones testified as follows.

**Trial Counsel:** State your name again?

**Jones:** Antonio Jones.

**Trial Counsel:** Were you a codefendant with a gentleman by the name of Kevin Wash in a Federal drug charge that was filed sometime around 1999?

**Jones:** Yes, sir.

**Trial Counsel:** Is there another defendant besides yourself and Mr. Wash?

**Jones:** My cousin, Consuela Jones.

**Trial Counsel:** During the course of those proceedings, did you cooperate with the government?

**Jones:** Yes.

**Trial Counsel:** And did you receive benefits for that cooperation with the government?

**Jones:** Yes.

**Trial Counsel:** And what did that cooperation require you to do at the trial of Kevin Wash?

**Jones:** Well, at first he was an informant and then he set me up and the guy, Joseph Cooley, came to me and asked me to come and testify to the drugs I sold him.

**Trial Counsel:** But Joseph Cooley is the United Stated Attorney handling that case, is that right?

**Jones:** Yes, sir.

**Trial Counsel:** Did you testify against Mr. Wash?

**Jones:** Yes, sir.

**Trial Counsel:** Did your testimony result in the conviction of Mr. Wash in Federal District Court in Hammond?

**Jones:** Yes, sir.

**Trial Counsel:** Did he receive a sentence?

**Jones:** Yes.

**Trial Counsel:** Did you receive any benefits in return for that testimony?

**Jones:** Yeah, I got four-and-a-half years. They gave me sixty months, but I didn't do nothing but four-and-a-half years.

**Trial Counsel:** What were you facing before you agreed to testify?

**Jones:** Ten to life.

**Trial Counsel:** Ten to life?

**Jones:** Yes.

**Trial Counsel:** Now did you in fact do time in the Department of Corrections?

**Jones:** Yes.

**Trial Counsel:** I'm sorry, Bureau of Prisons?

**Jones:** Yes.

**Trial Counsel:** Do you remember approximately when you were released?

**Jones:** 2002, June.

**Trial Counsel:** Now sometimes between 2002 and 2004, January of 2004, well, did you know any relationship between Kevin Wash and Lenzo Aaron?

**Jones:** Yes. They was cousins or friends or something of that nature.

21

**Trial Counsel:** So at least cousins, possibly relatives?

**Jones:** Right.

**Trial Counsel:** After you got out of the Bureau of Prisons and before this incident of January 16, did you have an encounter with Mr. Lenzo Aaron that was derived or originated as a result of your testimony?

**Jones:** Yes.

**Trial Counsel:** In Federal Court?

**Jones:** Yes.

**Trial Counsel:** Describe that incident to the court.

**Jones:** Well, I was coming from my sister's house, going to my car, and Mr. Lenzo Aaron told me that he knew what I did, talking about his cousin, Kevin Wash. At the time, he said his cousin, Kevin Wash, told him what I did. And I told him, I said, he should have told you what he did. And I got in the car and left. That's how I knew that he knew about that Kevin Wash situation.

**Trial Counsel:** And what threat did he make to you?

**Jones:** The threat that he made was, "You gonna get what you got coming to you."

**Trial Counsel:** I have no further questions.

**The Court:** The trial was what year?

**Jones:** I think it was 1999.

**The Court:** You got out of prison when?

**Jones:** 2002.

**The Court:** Kevin Wash went to prison what year?

**Jones:** I don't know when they sent him to prison. It's called *United States v. Kevin Wash.*

22

**The Court:** When was your cooperation against Kevin Wash?

**Jones:** My cooperation against Kevin Wash I think was in either '99 or 2000.

* * *

**Prosecutor:** Sir, this discussion that you had talked about between Mr. Aaron and yourself, when did that occur?

**Jones:** Like right after I had got out of prison.

**Prosecutor:** You got out of prison when?

**Jones:** In 2002.

*Id.* at 2036-40. During bench arguments, trial counsel conceded that Jones' testimony on

the threat was inadmissible hearsay. *Id.* at 2040. The trial court excluded the testimony

after noting the testimony that Jones and Aaron had amicably played cards on the same

team at the party shortly before agreeing to rob McClendon. *Id.* at 2042-43.

On direct appeal, the Court of Appeals of Indiana found that trial counsel had

waived this issue and that the exclusion of the testimony fell short of fundamental error,

concluding that the proffered evidence was not credible and lacked probative value.

ECF 18-7 at 6-7. The appellate court noted the two-year intervals between Jones'

participation in the Wash trial, the alleged threat, and Aaron's interview with law

enforcement as well as the friendly interaction between Jones and Aaron at the party. *Id.*

After reviewing the record, the court cannot find that the State court's

determination on this issue was unreasonable. With respect to credibility, Aaron

testified that he was "simply acquaintances" with Kevin Wash, that he did not know of

Jones' involvement in Wash's trial until Jones' first trial in May 2004, and that he did

not threaten Jones over his involvement in Wash's trial. No evidence corroborated

Jones' testimony to the contrary, and Jones, who was likely to receive a lengthy sentence

if the jury credited Aaron's narrative, had a substantial motive to fabricate a retaliatory

motive for Aaron. Moreover, even crediting Jones' testimony, the threat occurred nine

years before Aaron's testimony at Jones' second trial, and Aaron's decision to party and

then to commit robbery with Jones strongly suggests that he had relinquished any

animosity toward Jones as of January 2004. Because the State court's determination that

the threat evidence lacked credibility and probative value was not unreasonable, the

claim regarding the right to present a complete defense is not a basis for habeas relief.

Ineffective Assistance of Trial Counsel - Lenzo Aaron

Jones argues that he received ineffective assistance of trial counsel because trial

counsel failed to impeach Lenzo Aaron with prior inconsistent statements regarding the

intended targets of the robbery and calls received by Jones. To prevail on an ineffective

assistance of counsel claim in the State courts, a petitioner must show that counsel's

performance was deficient and that the deficient performance prejudiced him. *Strickland*

*v. Washington*, 466 U.S. 668 (1984). The test for prejudice is whether there was a

reasonable probability that "but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Id.* at 694. A reasonable probability is a

probability "sufficient to undermine confidence in the outcome." Id. at 693. In assessing

prejudice under *Strickland,* "[t]he likelihood of a different result must be substantial, not

just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). However, "[o]n habeas

24

review, [the] inquiry is now whether the state court unreasonably applied *Strickland*."

*McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even

'egregious' failures of counsel do not always warrant relief." *Id.*

At trial, Lenzo Aaron testified as follows.

**Prosecutor:** During the time that you were there, do you know if [Jones] received any phone calls?

**Aaron:** Yes.

**Prosecutor:** And can you tell us about that?

**Aaron:** It was -- he was talking to some young lady on the phone. They were talking freaky and that type of stuff.

**Prosecutor:** When you say freaky, tell the ladies and gentleman of the jury what you mean?

**Aaron:** I mean "talking" and that type of thing and that.

**Prosecutor:** Is that the language that they were using?

**Aaron:** Yes.

**Prosecutor:** How is it that you were able to hear that conversation?

**Aaron:** It was on speaker phone.

**Prosecutor:** Were other people listening to the conversation as well?

**Aaron:** Yes, ma'am.

**Prosecutor:** Do you have any idea at all as to what time that may have been?

**Aaron:** Not really, I don't remember the exact time.

**Prosecutor:** What's the next thing you remember happening?

**Aaron:** Nothing, just in the kitchen, sitting around pouring drinks, talking, that's when [Jones] came in and said, "We got a call from dude," and he just asked us, "Do you want to go rob him?

**Prosecutor:** [Jones] says he got a call from dude. Asked us if we want to go rob him. Who are the "us" you're referring to?

**Aaron:** Me and [Parks].

**Prosecutor:** Where were you when this conversation took place?

**Aaron:** In the kitchen.

**Prosecutor:** Do you recall if anybody else was in the kitchen when that conversation happened?

**Aaron:** No.

**Prosecutor:** I think I phrased the question poorly. Was anyone else in the kitchen when this conversation took place?

**Aaron:** No.

**Prosecutor:** So [Jones] says to you and [Parks], he got a call from dude, did you hear that telephone call?

**Aaron:** No, ma'am.

**Prosecutor:** Do you have any idea when that telephone call took place?

**Aaron:** No, ma'am.

**Prosecutor:** Did you know who "dude" was?

**Aaron:** No.

**Prosecutor:** Did he indicate to you why he was saying, "did you want to go rob this dude"?

**Aaron:** He just said he got six G's on him and a 9-piece and he was trying to --

**Prosecutor:** He said he had six G's trying to buy a 9-piece?

26

**Aaron:** Yes.

**Prosecutor:** 9-piece, meaning what?

**Aaron:** Dope.

Trial Tr. 1197-99.

On cross-examination, trial counsel attempted to establish that Aaron's version of the events was that the telephone call between Jones and McClendon occurred in his presence after the telephone call between Jones and Alexander and to then impeach him with telephone records.[2] *Id.* at 1282-94. When Aaron denied this version of the events, trial counsel attempted to establish that Aaron had testified to this version of the events in May 2004. *Id.* Specifically, trial counsel quoted the following testimony:

**Question:** It was a cellphone as opposed to a land line, is that correct?

**Answer:** Yes.

**Question:** Did you ever hear him identify who he was talking to at this time?

**Answer:** No.

**Question:** Did he ever identify to you who he was talking to?

**Answer:** No.

**Question:** How long did you say that conversation happened?

**Answer:** He was talking to him about fifteen minutes.

---

[2] In the quoted testimony, Aaron refers to a "young lady" and a "dude." While Aaron may not have been aware of their identity, these individuals were identified at trial through other evidentiary sources as Alexander and McClendon.

**Question:** Were you in his presence when he was on the phone the whole time?

**Answer:** Yes.

**Question:** What did he say to you when he got off the phone?

**Answer:** He didn't say nothing to me.

**Question:** Where were you?

**Answer:** We was sitting, everyone in the house laughing.

**Question:** Why were you laughing?

**Answer:** He was asking the girl if he could come over.

**Question:** And have sex with her?

**Answer:** Yeah.

*Id.* at 1289-90. The prosecution argued that, while the transcript said, "He was talking to *him* about fifteen minutes," it was clear from the context that Aaron was referring to the conversation between Jones and Alexander rather than the conversation between Jones and McClendon, and Aaron confirmed this interpretation and that "him" was a misprint. *Id.* at 1292-93.

At the post-conviction stage, Jones argued that Aaron should have been impeached with prior testimony that the call between Jones and Alexander lasted seven minutes. ECF 18-10 at 33-37. The Court of Appeals of Indiana found that trial counsel did not provide ineffective assistance by declining to further impeach Aaron's testimony about the telephone calls, reasoning that the salient point was the content of the calls rather than the details of who initiated the calls or their precise duration. ECF

28

18-13 at 18-24. Jones also argued that trial counsel should have impeached Aaron by highlighting Aaron's testimony that Jones told him that McClendon had money and drugs instead of money to buy drugs. ECF 18-10 at 33-37. The appellate court also found trial counsel did not provide ineffective assistance by declining to impeach Aaron in this manner. ECF 18-13 at 24-26. The appellate court noted that Aaron did not testify that McClendon had money and drugs and that it was unclear what Aaron would have said if the prosecution had not interrupted. *Id.* The appellate court reasoned that the salient point of this testimony was that Jones had told Aaron that McClendon had money and invited Aaron to rob him. *Id.*

After reviewing the record, the court cannot find that the State court made an unreasonable determination on this claim. Trial counsel was not ineffective for failing to impeach Aaron at the second trial in 2011 for estimating that the duration of a telephone call that took place at a party seven years ago was seven minutes rather than fifteen minutes. The court similarly declines to find trial counsel ineffective for failing to highlight Aaron's brief inability to articulate exactly what Jones had said to him seven years ago. Therefore, the claim that trial counsel failed to properly impeach Aaron is not a basis for habeas relief.

Here, the court will also address the argument in the proposed second amended traverse. In that filing, Jones argues that Aaron testified that Jones received a call from McClendon in the hour preceding the robbery and that the prosecution introduced telephone records after Aaron testified to prevent trial counsel from using them to impeach Aaron regarding this testimony. Contrary to Jones' argument, Aaron testified

that he did not know when the telephone call between Jones and McClendon occurred.

Further, Jones does not explain how the timing of the admission of the telephone

records prevented trial counsel from using them. Trial counsel could have sought to

introduce the certified records at any time or could have highlighted the inconsistencies

between the records and Aaron's testimony at closing. This argument is not a basis for

habeas relief.

### Ineffective Assistance of Trial Counsel - Janeth Alexander

Jones argues that he received ineffective assistance of trial counsel because trial

counsel failed to impeach Janeth Alexander with prior inconsistent statements

regarding his demeanor immediately after the murders and because trial counsel failed

to ask for an admonishment or a mistrial when Alexander testified that Jones

threatened to kill her.

At trial, Alexander testified as follows:

**Prosecutor:** Okay. So he gets into the car with you. What was his demeanor or how was he acting once he got in the car with you?

**Alexander:** Quiet.

**Prosecutor:** Was that normal for him?

**Alexander:** No.

* * *

**Prosecutor:** Now I believe that you've provided testimony at another proceeding in -- it would have been toward the end of May in 2004. After providing that testimony, did you, in fact, have communication or were you contacted by the defendant?

**Alexander:** He called -- [Jones] called my job.

30

**Prosecutor:** And what did he say?

**Alexander:** He had me thinking that he had got released.

**Prosecutor:** And do you recall what he said? Was this a good call, baby, I am coming home? What was the nature of the call?

**Alexander:** No, it was a scary call to me because I was scared of him.

**Prosecutor:** Okay. And do you remember what he said?

**Alexander:** That he -- no. I believe he said he was going to kill me or get me or something like that. But I know I left for work.

**Prosecutor:** Okay.

**Alexander:** Because I thought he was out.

Trial Tr. 1654-55, 1670-71.

Trial counsel objected that Alexander's response was vague and suggested that the trial court instruct the jury to disregard it. *Id.* at 1671-74. The trial court suggested that the matter be clarified through further questioning. *Id.*

**Prosecutor:** Miss Alexander, the phone call that you're talking about to your job, do you remember specifically what was said?

**Alexander:** He said something that scared me. Like he was going to --

**Trial Counsel:** Okay. Objection because if she is saying like, it is not what.

**The Court:** Alright. Sustained.

**Prosecutor:** Let me ask you this then. What was your reaction to what was said to you?

**Alexander:** I was scared and left work.

**Prosecutor:** Alright. So you, in fact, left your job immediately?

**Alexander:** I sure did.

*Id.* at 1674-75.

On post-conviction review, Jones argued that trial counsel should have impeached Alexander's testimony regarding his demeanor with the following testimony from a deposition in 2004. ECF 18-10 at 38-39.

**Question:** When you picked [Jones] up on the evening of January 16, 2004, how we he acting?

**Answer:** His self.

**Question:** He was acting himself?

**Answer:** He was acting himself.

**Question:** And what is that like when you say "himself"?

**Answer:** He didn't seem like anything was wrong.

**Question:** So he wasn't nervous.

**Answer:** No.

**Question:** Scared?

**Answer:** No.

**Question:** He didn't seem agitated or anything?

**Answer:** No. But the next morning, that Saturday, I fixed him breakfast, he didn't want to eat.

PCR. App. Ex. 10.

The Court of Appeals of Indiana found that trial counsel did not provide ineffective assistance with respect to the threat testimony, noting that trial counsel requested a limiting instruction. ECF 18-13 at 12-18. The appellate court further

reasoned that threats made by the accused against the prosecution's witnesses may be considered to be admissions of guilt and are thus relevant and admissible. *Id.* The appellate court also found that trial counsel did not provide ineffective assistance or prejudice Jones by declining to impeach Alexander's testimony regarding Jones's demeanor, noting that it was a relatively minor inconsistency. *Id.*

The court agrees that trial counsel did not provide ineffective assistance by declining to seek a mistrial based on admissible testimony of Jones threatening to kill Alexander and that the inconsistencies regarding his demeanor after the murders were largely immaterial. Therefore, the claim that trial counsel provided ineffective assistance with respect to Alexander is not a basis for habeas relief.

### *Martinez* Exception

Jones argues that the court should excuse procedural default based upon *Martinez* for his claims that trial counsel provided ineffective assistance by failing to object to the prosecution's arguments about his telephone calls to McClendon, for defects in the charging information, and for cumulative error. "[A] prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez v. Ryan*, 566 U.S. 1, 14 (2012). Consequently, the court will now consider whether these arguments or claims have any merit.

Jones argues that trial counsel provided ineffective assistance by failing to object to the prosecution's statements during opening statements and closing arguments that telephone records demonstrated that he had several telephone calls with McClendon at

various times before 7:00 p.m. on the date of his murder. He maintains that these statements were inconsistent with Aaron's testimony that Jones received a call from McClendon in the hour preceding the robbery between 10:00 p.m. and 11:00 p.m. At trial, Aaron testified that he did not know when the telephone call between Jones and McClendon occurred. Trial Tr. 1199. Even if Aaron had testified that the telephone call took place in the late evening, it is unclear why this would prevent the prosecution from referring to the records listing the telephone calls that took place earlier that day. The court finds that this procedurally defaulted claim lacks merit and is not a basis for habeas relief.

Jones argues that trial counsel provided ineffective assistance by failing to object to the defects in the charging information on the basis that it improperly indicated that a knowing or intentional state of mind was an element of felony murder and improperly omitted what property Jones intended to take from the victims. He maintains that these defects impeded his ability to prepare a defense. Even assuming that the charging information was defective, Jones does not explain how it impeded his ability to prepare a defense or how he would have prepared differently with adequate notice. At the post-conviction stage, trial counsel testified that the charging information did not impede his ability to defend Jones. PCR Tr. 220-25. Moreover, the trial at issue was Jones' second trial based on the charging information, and Jones had been continuously engaged in litigation related to these charges in the seven years between the first trial and the second trial, so Jones was necessarily apprised of the prosecution's case against him. *See e.g., ECF 18-1; Jones v. Finnan*, 2:09-cv-52 (S.D. Ind. filed Feb. 2009);

*Jones v. Basinger*, 625 F.3d 1030 (7th Cir. 2011). The court finds that this procedurally defaulted claim lacks merit and is not a basis for habeas relief.

Finally, Jones argues that the cumulative errors of trial counsel amounted to ineffective assistance. "[P]rejudice may be based on the cumulative effect of multiple errors. Although a specific error, standing alone, may be insufficient to undermine the court's confidence in the outcome, multiple errors together may be sufficient." *Malone v. Walls*, 538 F.3d 744 (7th Cir. 2008). As detailed above, Jones has not demonstrated that trial counsel erred. The court further finds that the outcome of the trial would have likely remained the same even if trial counsel had implemented the tactics suggested by Jones in the amended petition and in the proposed second amended traverse. The evidence against Jones was strong, if not overwhelming, and the benefits of the suggested tactics, which include impeaching witnesses on immaterial issues and lodging futile objections, would have been minimal. Consequently, this procedurally defaulted claim lacks merit and is not a basis for habeas relief.

<u>CERTIFICATE OF APPEALABILITY</u>

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v.*

*McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Jones to proceed further.

For these reasons, the court DENIES the amended habeas corpus petition (ECF 3); DENIES the motion to amend the traverse (ECF 106); DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on May 11, 2021

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT